IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONDALE NICHOLS,<br>    Plaintiffs,<br><br>    v.<br><br>NICHOLAS F MORRISEY, SIMPSON &<br>BROWN, INC., SALES LEASING<br>COMPANY, INC.,<br>    Defendants. | CIVIL ACTION<br><br><br><br>NO. 2:23-CV-00637-WB |

**MEMORANDUM OPINION**

This case arises from a motor-vehicle accident. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702, Defendants moved to exclude the opinions of Plaintiffs' experts, Geoffrey Temple, DO, and James R. Quinn, RN, regarding Rondale Nichols' alleged injuries, damages, future medical treatment, and future medical expenses. For the reasons explained below, Defendants' motion will be denied.

**I.      BACKGROUND**

The facts here are straightforward: Nichols alleges that Defendant Nicholas Morrisey backed a construction truck owned by Defendants Simpson & Brown, Inc., and Sales Leasing Company, Inc., into Nichols' vehicle. He says he sustained serious and permanent injuries to his head, back, and left leg. He also claims that the crash caused him emotional injuries, a loss of earnings or earning capacity, and future medical and rehabilitative expenses.

**II.     LEGAL STANDARD**

*Daubert* established a gatekeeping role for trial courts in admitting expert testimony. The *Daubert* standard is codified in Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

1

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *In re TMI Litigation*, 193 F.3d 613, 705 (3d Cir. 1999) (citing *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994) ("*Paoli II*")). Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

### III. DISCUSSION

Defendants contest the testimony of Dr. Temple on the grounds that he is not qualified and that his methodology is unreliable. They challenge Nurse Quinn's testimony on the grounds that because his report relies entirely on Dr. Temple's, its methodology is insufficient and it is therefore unreliable.

#### A. Dr. Temple

In his report, Dr. Temple—offered by Nichols as an expert on his diagnoses and future treatment—opines that Nichols' physical injuries "are related directly" to the accident. Dr. Temple states further that, although at the time of the 2021 crash Nichols was already disabled from a 2014 gunshot wound, the crash made him "more disabled and more impaired." Dr. Temple sets forth recommendations for future treatment, including annual evaluations by a physician, repeat CT scans every other year, evaluation by a pain-management specialist for consideration of a series of three lumbar epidural steroid injections, and one electromyography test.

##### i. Dr. Temple's Qualifications

Defendants argue that Dr. Temple's training and practice as a "family medicine" doctor are insufficiently specialized to qualify him as an expert in this case. Dr. Temple, they claim, "opines about medical issues which appear to be beyond his Family Medicine specialty."

Qualification under Rule 702 requires that "a witness proffered to testify to specialized knowledge [] be an expert." *Paoli II*, 35 F.3d at 741. But the specialized-knowledge requirement is "interpreted . . . liberally," and "a broad range of knowledge, skills, and training qualify an expert as such." *Id.* The basis of specialized knowledge "can be practical experience as well as academic training and credentials," and "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Elcock*, 233 F.3d at 741 (3d Cir. 2000) (citing *Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998)) (quotations removed).

"[T]here is no evidence," Defendants argue, "that Dr. Temple has any training or experience" in "interpreting a CAT scan," "diagnosing or treating partial paralysis/incomplete paraplegia of the spine," or "diagnosing or treating head injuries" in "his Family Medicine practice."

But, *Daubert* does not require a physician expert to specialize in the field or sub-field regarding which he testifies. Instead, "a physician is entitled to render an opinion in medical fields which are outside his area of specialization," and "the fact that a doctor is not a specialist in a particular field goes not to the *admissibility* of the opinion but rather to the *weight* that the jury may wish to place upon it." *Cree v. Hatcher*, 969 F.2d 34, 38 n.5 (3d Cir. 1992) (emphasis added). *See also Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate") (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777

3

(3d Cir. 1996)).  Although, as Defendants explain, *their* expert believes Dr. Temple's training insufficiently specialized, what their expert believes about the qualifications of Plaintiff's expert is not the relevant inquiry.  In any case, the respective credibility of dueling experts is a matter for the jury.  *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 165 (3d Cir. 2003)).

### ii.  Reliability of Dr. Temple's Testimony

With respect to the reliability of Dr. Temple's testimony, Defendants argue that his opinions "as to [Nichols'] injuries, damages, future medical treatment and associated costs" are "unreliable because they provide no analysis or methodology for any of their conclusions."  They assert further that *Daubert* requires a court to "make a preliminary assessment of the reliability of the expert's opinion by reviewing the reasoning and methodology underlying [it]," and that such an assessment is impossible here because, they say, Dr. Temple "provide[s] no methods whatsoever," and therefore Dr. Temple's testimony amounts to impermissible "unsupported speculation."  Defendants suggest that, for instance, Dr. Temple could have provided "specific statistical analysis, known statistical outcomes associated with the type of alleged injuries sustained, clinical experience, research, or knowledge of the factors pertaining to [Nichols]" on which Dr. Temple might have based his conclusions.

An expert's opinions must "reliably flow from the facts known to the expert and the methodology used."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).  And an expert's conclusions must be based on the "methods and procedures of science," not on "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Therefore, the focus of reliability is "solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 580.

a.  <u>Diagnosis and Causation</u>

1. Diagnosis

Dr. Temple diagnoses "disc herniations" that "represent a permanent compromise in structure [and] function," and he notes the records "would reflect" a "left lower extremity radiculopathy" and a "lumbar radiculopathy." He states that Nichols has "[a]cute posttraumatic disc herniations at L3-L4, L4-L5, and L5-S1," "[r]esidual acute posttraumatic aggravation of pre-existing lumbar degenerative disease," and "[r]esidual acute posttraumatic lumbar myositis." In reaching these conclusions, he primarily relies on the examinations of other practitioners: a lumbar CAT scan report and images, treatment records from Nichols' rehabilitation center, and billing records.

Defendants rightly do not challenge the reliability of these diagnoses. "[I]t is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners." *Kannankeril*, 128 F.3d at 807 (3d Cir. 1997), as amended (Dec. 12, 1997). With regard to Nichols' alleged disc herniations, "foraminal narrowing," "degenerative changes," and "straightening of the lumbar lordosis," Dr. Temple "agree[d] with [the] interpreting radiologist" who read the CAT scan report. With regard to Nichols' alleged pain and prior treatment and rehab, Dr. Temple likewise relies on the records of treatment by previous doctors and rehabilitation professionals. Because Dr. Temple used standard medical records on which he may rely consistent with *Daubert* and Rule 702 (and, as explained above, he was qualified to interpret those records) to reach his conclusions with regard to diagnosis, he will not be precluded from testifying as to his diagnoses of Nichols' alleged injuries.

2. Causation

A physician "can give an opinion on the cause of a plaintiff's illness" so long as "he or she can do so with a *reasonable degree* of medical certainty." *Heller v. Shaw Indus., Inc.*,

5

167 F.3d 146, 153 n.4 (3d Cir. 1999) (citing *Paoli II*, 35 F.3d at 750). In his report, Dr. Temple states that Nichols' disc herniations were "caused or aggravated by the trauma [of the accident]." It also states that Nichols "did have disabilities prior to" the accident, including a "left lower extremity paraplegia and foot drop" from a 2014 gunshot wound, but Dr. Temple "feel[s]" that the accident "ma[de Nichols] more disabled and more impaired than he was" before it. "It is my opinion," Dr. Temple states, that Nichols "has not improved to his pre-injury level of function." He concludes that "[t]he diagnoses in [his] report are related directly to the trauma of [the accident]," and states that he renders his opinions "within a reasonable degree of medical certainty."

As *Paoli II* notes, a prototypical *Daubert* analysis does not always map neatly onto an expert physician's diagnosis of an individual patient. The diagnosis of an individual patient "involves far more elements of judgment than does a scientific study attempting to test a more general scientific proposition." *Paoli II*, 35 F.3d at 758. Courts have identified *differential diagnosis* as a diagnosis method likely to reliably produce accurate results. Differential diagnosis is the process of determining the cause of an affliction by eliminating alternative possible causes. *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 849 (3d Cir. 1990) ("*Paoli I*").

And whereas "assessing scientific validity (and therefore evidentiary reliability)" involves "the ability of other scientists to test or retest a proponent's theory," differential diagnosis:

> involves assessing causation with respect to a particular individual. . . . Although . . . differential diagnosis generally is a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results, it is a method that involves assessing causation with respect to a particular individual. As a result, the steps a doctor has to take to make that (differential) diagnosis reliable are likely to vary from case to case.

*Id.* As did the court in *Paoli II*, here we confront an individual doctor's diagnosis of an individual patient.

"[P]erformance of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis." *Paoli II*, 35 F.3d at 758. The "[p]erformance of [these] standard diagnostic techniques provides prima facie evidence that a doctor has considered [alternative] causes and has attempted to test his or her initial hypothesis as to cause." *Paoli II*, 35 F.3d at 759. The *Paoli* court explained that the differential-causation-determination requirement sits on a spectrum—just as there are complicated cases, there might, for instance, be obvious cases in which minimal standard diagnostic techniques are required for a reliable conclusion as to causation. For example, in the case of a patient with "medical records that include x-rays showing a fractured arm" who "tells the doctor that he hurt the arm in a biking accident," a doctor "could reliably conclude that the patient had a fractured arm caused by a biking accident even without physically examining the patient or taking a medical history," because "[t]he biking accident is so much more likely to have been the cause of the fracture than anything else that there is no need to examine alternatives." *Id.* at 759-60.

Although Dr. Temple in his report states that the accident caused "additional disability" distinguishable from the disability caused by the "gunshot wound [Nichols] suffered in 2014 resulting in a left lower extremity paraplegia and foot drop," he does not explain in detail the evidence that led to his conclusion. Nonetheless, he does consider at least one alternative cause (if briefly), and it includes all the *Paoli II* indicia suggesting he considered and ruled out alternative causes: a physical examination, a review of medical records, the taking of a medical

7

history, and a review of laboratory-test results. Accordingly, Dr. Temple will not be precluded from opining as to the cause of Nichols' alleged injuries.

### b. Treatment Recommendations

Dr. Temple recommends a series of prohibitions and treatments for Nichols. In full, Dr. Temple recommends that:

> [Nichols] should lift/push/pull/carry no more than 5-10 pounds occasionally. He should bend at the waist rarely. He should avoid activities along with a high degree of repetition or impact. Further it is my opinion Mr. Nichols has not improved to his pre-injury level of function due to the trauma of September 24, 2021. Further reasonable care would include a physician evaluation annually. He should have repeat CT scans every other year to assure stability. Further, evaluation by a pain management specialist for consideration for a series of three lumbar epidural steroid injections annually x3 years, when as needed would be reasonable and appropriate. In addition further reasonable care; I feel one EMG would be reasonable and appropriate.

As Defendants correctly note, *Oddi v. Ford Motor Co.* teaches that an expert must use methodology "beyond his own intuition." 234 F.3d 136, 146 (3d Cir. 2000). Indeed, under *Oddi*, "[a]court may conclude that there is simply too great a gap between the data and the opinion proffered." *Id.*

But in order to exclude expert testimony, the "gap" must be extreme. The excluded expert in *Oddi* proposed to testify as to the success of scientific hypotheses he had never studied or tested. That is the sort of "haphazard, intuitive inquiry" *Oddi* prohibits. 234 F.3d at 156. Likewise, in *General Electric Co. v. Joiner*, the Supreme Court upheld a district court's exclusion of expert testimony because the expert attempted to establish a link between the plaintiff's exposure to chemicals and his cancer many years later without any scientific studies suggesting the possibility of such a link. 522 U.S. 136, 146 (1997); *see also Heller*, 167 F.3d at 155 (characterizing *Joiner* and clarifying that studies are not always required to establish causation). These cases demonstrate that the "gap" between evidence and conclusion is "too

great" only in extreme and clear instances—where, for instance, an expert's conclusion "so overstates its predicate . . . that it cannot legitimately form the basis for a jury verdict." *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992) (upholding the exclusion of an expert's scientific testimony in part because the expert disagreed with other established experts, using no scientific reasoning).

As *Oddi* explains, "conclusions and methodology are not entirely distinct from one another," and a court must determine whether an expert's conclusions "could reliably flow from the facts known to the expert and the methodology used." 234 F.3d at 146 (citing *Heller*, 167 F.3d at 153 (3d Cir. 1999)) (emphasis added); *see also In re TMI Litigation*, 193 F.3d at 682-683 (evaluating an expert's conclusions to determine whether the methodology used to produce them was reliable).  Here, Dr. Temple's treatment recommendations plainly flow from the examinations he performed and the tests he reviewed.  As detailed above, Dr. Temple used standard diagnostic techniques, and "when a doctor employs standard diagnostic techniques, his or her testimony is much more readily admissible." *Paoli II*, 35 F.3d at 759.  And as Nichols explains, Dr. Temple has "considerable clinical practice and training," and he drew on his experience to reach his conclusions regarding Nichols' treatment.

Above all, "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004).  Dr. Temple's testimony clears this low bar for admissibility. Its persuasiveness is a matter for the jury.

Accordingly, Dr. Temple's testimony will not be precluded.[1]

### B. Nurse Quinn

Nichols also offer James R. Quinn, RN, a certified life-care planner and certified medical-cost projection expert, as an expert on the cost of Nichols' future medical treatment. Nurse Quinn reviewed billing records and Dr. Temple's expert report. In his report Nurse Quinn calculates that, based on current medical-fee data for the Philadelphia area, Dr. Temple's recommended course of treatment would cost Nichols approximately $85,502.79.

Defendants attack the reliability of Nurse Quinn's report on the grounds that because Nurse Quinn's report is based on Dr. Temple's report (and, they argue for reasons detailed above, Dr. Temple's report is unreliable), Nurse Quinn's report must be "precluded as unscientific and/or patently unreliable." Nichols acknowledges that Nurse Quinn's report is based on Dr. Temple's: Nurse Quinn, Nichols explains, "took each treatment recommendation and the recommended duration and frequency made by Dr. Temple" and determined the likely cost.

As explained above, Dr. Temple's testimony is admissible, so Defendants' sole argument regarding Nurse Quinn's testimony fails. In any case, Nurse Quinn's testimony is admissible. An expert is permitted to rely on the opinion of another expert in drawing his conclusions. *See Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data"). And so

---

[1] Defendants cite two unpublished cases to support their contention that Dr. Temple's report must be excluded for want of methodology: *Williams v. United States*, 321 F. App'x 129, 132 (3d Cir. 2008), and *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008). Neither is apposite here. In *Williams*, the district court could not "discern a testable hypothesis to support [the expert's] opinions" or "any standards governing [his] analysis." But the *Williams* expert was an engineer and the court evaluated his opinions under the prototypical *Daubert* analysis. As explained above, this case presents a situation unlike the prototypical *Daubert* analysis—Dr. Temple's examining Nichols and his reading of Nichols' medical records did not require him to refer to any "testable hypotheses" or "standards [of] analysis." Along similar lines, in *Murray* the court upheld the exclusion of the testimony of a security-industry consultant who testified that a security system deviated from industry standards—but testified in deposition that in fact the security industry had "very few standards" and that he was "writing the standards for the industry." *Murray*, 311 F. App'x 521 at 524. Dr. Temple's testimony includes no such self-contradiction; as explained above, his conclusions flow reliably from his analysis without conflict.

long as an expert is "familiar[] with the methods and the reasons underlying [another expert's] projections," the credibility of his use of the underlying expert's report is matter for cross-examination, not for pretrial exclusion.  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012).  Nurse Quinn's report indicates that he is sufficiently familiar with Dr. Temple's report.

Moreover, Nurse Quinn calculated the "costs associated with future care recommendations of Nichols as recommended by Dr. Temple" using "several databases containing the usual, reasonable, and customary costs of treatments for the geographic area where Plaintiff resides."  He used statistical analysis and detailed his sources, methods, and calculations.  His method too clears the low methodology bar of *Daubert* and its successors.

Accordingly, Nurse Quinn's testimony will not be precluded.

IV.     CONCLUSION

For these reasons, Defendants' Motion will be denied.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

**WENDY BEETLESTONE, J.**